[No. C051749. Third Dist. July 3, 2007.]

THE STATE OF CALIFORNIA ex rel. PENSION OBLIGATION BOND COMMITTEE, Plaintiff and Appellant, v.
ALL PERSONS INTERESTED IN THE MATTER OF THE VALIDITY OF THE CALIFORNIA PENSION OBLIGATION BONDS TO BE ISSUED, Defendant and Respondent.

1388

## COUNSEL

Bill Lockyer, Attorney General, Louis R. Mauro and Stacy Boulware Eurie, Assistant Attorneys General, Christopher E. Krueger and Jennifer K. Rockwell, Deputy Attorneys General, for Plaintiff and Appellant.

M. David Stirling, John H. Findley and Harold E. Johnson for Defendant and Respondent.

## OPINION

**HULL, J.**—The State of California (the State), through its Pension Obligation Bond Committee (the Committee), brought this action pursuant to Government Code section 16934 and Code of Civil Procedure section 860 et sequitur to obtain a declaration of the validity of recent legislation authorizing the issuance of bonds under certain limited circumstances to finance the State's employer obligation to fund pensions. The Committee argued the bonds fall within an exception to a state constitutional limitation on the creation of new debt (Cal. Const. art. XVI, § 1; unspecified article references that follow are to the California Constitution) for debts incurred to meet an obligation imposed by law. According to the Committee, the obligation to fund employee pensions is one imposed by law within the meaning of this exception.

The trial court disagreed with the Committee, concluding the pension obligation is one imposed by the State on itself and, therefore, does not fall within an exception for obligations imposed by law. The court entered judgment against the Committee.

We agree the bonds are not exempt from the constitutional debt limit and affirm the judgment.

### STATUTORY AND PROCEDURAL BACKGROUND

### I

### *Introduction*

In 1929, a state commission on pensions recommended the establishment of a retirement system for state employees. (*Valdes v. Cory* (1983) 139 Cal.App.3d 773, 780 [189 Cal.Rptr. 212] (*Valdes*).) The commission "stressed

the need to place a retirement system on a 'sound financial basis, where liabilities are provided for as they are *incurred*, rather than when they mature.' " (*Ibid.*)

The following year, the state Constitution was amended to empower the Legislature to create a state employee retirement system (former art. IV, § 22a, repealed Nov. 8, 1966). (*Valdes, supra*, 139 Cal.App.3d at p. 780.) In 1931, "the Legislature established the State Employees' Retirement System, presently known as [the Public Employees Retirement System or] PERS. (Stats. 1931, ch. 700, § 25, p. 1444; Gov. Code, [former] § 20004.) The system included a fund derived from mandatory employee payroll contributions (member contributions), contributions of the state, and earnings on the investment of the fund. (Stats. 1931, ch. 700, §§ 41, p. 1445, 63, p. 1448, 65–74, pp. 1448–1451.)" (*Claypool v. Wilson* (1992) 4 Cal.App.4th 646, 653 [6 Cal.Rptr.2d 77], fn. omitted.) A board of administration (the PERS Board) was created to administer the system. (*Id.* at pp. 653–654.)

The original enactments created a retirement benefit system commonly referred to as a "money purchase plan," whereby the amount of benefits provided depended on the amount of money in the pensioner's account at the time of retirement. (*Valdes, supra*, 139 Cal.App.3d at p. 781; see Stats. 1931, ch. 700, §§ 81–83, p. 1452.) These enactments were repealed in 1945 but reenacted in essential part as the state employees' retirement law (the Retirement Law) (Stats. 1945, ch. 123, §§ 1–2, pp. 535–609). (*Claypool v. Wilson, supra*, 4 Cal.App.4th at p. 654.)

By 1947, PERS (Public Employees Retirement System) had become a defined benefit plan, with fixed benefits for pensioners and actuarially determined, fixed contribution rates for employers. (Stats. 1947, ch. 732, § 1, p. 1784.) By 1968, the Legislature had empowered the PERS Board to adjust the fixed rates of employer contributions in accordance with updated actuarial valuations (Stats. 1967, ch. 1631, §§ 29, p. 3903, 35, p. 3904). (*Valdes, supra*, 139 Cal.App.3d at p. 782.)

Beginning in 1982, both the Governor and the Legislature began devising means of balancing the state budget by limiting or delaying the state's employer contribution obligations to PERS. "For example, in 1982 legislation was enacted to bar the state from making a contribution for a portion of that year and to require the shortfall to be made up from the [PERS] reserve against deficiencies. [Citation.] Until 1990, the state paid employer contributions on a monthly basis. [Citation.] In 1990, the Legislature changed the payment schedule from monthly to quarterly. In 1991, the Legislature temporarily changed the payment schedule from quarterly to semiannually. In 1992 legislation 'changed the schedule to "semiannually, six months in arrears."

Legislation in 1993 changed the schedule to "annually, 12 months in arrears." ' [Citation.] In 1991, legislation was passed to repeal statutes providing for cost of living benefits to retirees, and to use these funds to meet the state's employer contribution requirement. [Citation.] Also in 1991, legislation was passed transferring the actuarial function to the Governor." (*Westly v. Board of Administration* (2003) 105 Cal.App.4th 1095, 1100 [130 Cal.Rptr.2d 149].)

In November 1992, the voters adopted Proposition 162, the California Pension Protection Act of 1992, which, among other things, added to article XVI, section 17 "the requirement that the PERS Board have 'sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system.' (Cal. Const., art. XVI, § 17, subd. (e).) Proposition 162 contained a statement of 'Findings and Declaration,' which stated in part: ' "Politicians have undermined the dignity and security of all citizens who depend on pension benefits . . . by repeatedly raiding their pension funds. . . . [¶] . . . To protect the financial security of retired Californians, politicians must be prevented from meddling in or looting pension funds." ' (Historical Notes, 3 West's Ann. Const. (1996 ed.) art. XVI, § 17, p. 114 [Prop. 162, § 2, subds. (c)–(d)].) Proposition 162 also contained a statement of 'Purpose and Intent,' in which the voters declared their purpose and intent in passing Proposition 162 was, inter alia, ' "to strictly limit the Legislature's power over [public pension] funds, and to prohibit the Governor or any executive or legislative body of any political subdivision of this state from tampering with public pension funds." ' (Historical Notes, 3 West's Ann. Const., *supra*, art. XVI, § 17, p. 114 [Prop. 162, § 3, subd. (e)].)" (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1121 [61 Cal.Rptr.2d 207].)

In 1996, the Legislature repealed and reenacted the Retirement Law. (Stats. 1995, ch. 379, §§ 1, p. 1955, 2, p. 1955.) Chapter 9 of the current law addresses employer contributions. (Gov. Code, § 20790 et seq.; further undesignated section references are to the Government Code.) Section 20814 reads:

"(a) Notwithstanding any other provision of law, the state's contribution under this chapter shall be adjusted from time to time in the annual Budget Act according to the following method. As part of the proposed budget submitted pursuant to Section 12 of Article IV of the California Constitution, the Governor shall include the contribution rates submitted by the actuary of the liability for benefits on account of employees of the state. The Legislature shall adopt the actuary's contribution rates and authorize the appropriation in the Budget Act.

"(b) The employer contribution rates for all other public employers under this system shall be determined on an annual basis by the actuary and shall be effective on the July 1 following notice of a change in rate."

In each fiscal year, the State pays to PERS the employer contribution as determined by the PERS Board. Appropriations are made from the general fund on a quarterly basis to cover the employer's contribution (§ 20822), except where the employee is compensated from a special fund, in which case the employer's contribution is taken from that special fund (§ 20824).

The State has never issued bonds to finance its PERS contributions.

## II

### *The Financing Act and Resolution No. 2003-1*

In 2003, the Legislature enacted the California Pension Obligation Financing Act (the Financing Act) (§ 16910 et seq., added by Stats. 2003, 1st Ex. Sess., ch. 11, § 5). The Financing Act authorized "the issuance of bonds and the creation of ancillary obligations . . . for the purpose of funding or refunding the state's pension obligations . . . ." (Legis. Counsel's Dig., Sen. Bill No. 29 (2003–2004 1st Ex. Sess.); see § 16921, subd. (a).) It also established the Committee for the purpose of issuing and selling the bonds and ancillary obligations authorized by the Financing Act (§ 16920, added by Stats. 2003, 1st Ex. Sess., ch. 11, § 1) and created the pension obligation bond fund for the deposit of funds generated through the issuance of bonds (§ 16929, added by Stats. 2003, 1st Ex. Sess., ch. 11, § 1).

On May 27, 2003, the Committee adopted resolution No. 2003-1 authorizing the issuance of bonds in an amount not to exceed $2,003,000,000 to pay a portion of the State's employer contribution to PERS for fiscal year 2003–2004.

The next day, the Committee filed a validation action seeking a declaration of the legality of resolution No. 2003-1. In that action, the Committee asserted bonds issued pursuant to the Financing Act are exempt from article XVI, section 1. As shall be described in more detail below, that constitutional provision prohibits the Legislature from creating debts in excess of $300,000 without a two-thirds vote and approval of the electorate.

The trial court ruled against the Committee, concluding the resolution violated the constitutional debt limit.

### III

*The Bond Act and Resolution No. 2004-1*

In 2004, the Legislature enacted pension reform legislation that, among other things, introduced an alternate retirement program for new state employees. (Stats. 2004, ch. 214, § 1.) According to the Legislative Counsel's Digest, this legislation provides "that state employees who become members of the Public Employees' Retirement System after the effective date of the bill shall not make contributions to the system, nor receive service credit for their service, and the state employer shall not make contributions on their behalf, during their first 24 months of employment." (Legis. Counsel's Dig., Sen. Bill No. 1105 (2003–2004 Reg. Sess.) Stats. 2004, ch. 214.) Instead, those employees would be required "to contribute 5% of their monthly compensation to an alternate retirement program, to be developed by the Department of Personnel Administration." (*Ibid.*) Thereafter, the employee "may elect to receive service credit for that 24-month period of service and transfer his or her accumulated contributions in the alternate retirement program from that program to the retirement system." (*Ibid.*)

The Legislature also enacted the California Pension Restructuring Bond Act of 2004 (the Bond Act) (§ 16940 et seq.), which became effective as an emergency measure on August 11, 2004. (Stats. 2004, ch. 215, § 6.) According to the Legislative Counsel's Digest, the Bond Act authorizes "the issuance, during any 2 fiscal years after June 30, 2004, of up to $2 billion of bonds and the creation of ancillary obligations, as defined, for the purpose of funding or refunding the state's obligations to the Public Employees' Retirement Fund." (Legis. Counsel's Dig., Sen. Bill No. 1106 (2003–2004 Reg. Sess.).)

The legislative intent underlying the Bond Act is stated in section 16941: "It is the intent of the Legislature, in enacting this chapter, to provide for an efficient, equitable, and economical means of satisfying certain pension obligations of the state. Bonds shall be issued pursuant to this chapter only when the Director of Finance determines that the state's pension obligations are anticipated to be reduced as a result of changes in the Public Employees' Retirement Law that reduce contributions to the Public Employees' Retirement System, and it is in the best interest of the state to issue bonds pursuant to this chapter to accelerate a portion of the state's anticipated lower pension obligations."

Under the Bond Act, the Committee is authorized, among other things, to, "[u]pon the request of the Director of Finance, and following receipt of the determination of the Director of Finance pursuant to Section 16941, issue

taxable or tax-exempt bonds for the purpose of funding or refunding pension obligations, paying related costs and ancillary obligations, or refunding any bonds previously issued pursuant to [the Bond Act]." (§ 16945, subd. (a).) Such bonds shall be a debt of the state payable from the general fund. (§ 16946.) However, "[t]he cumulative amount of outstanding bonds issued pursuant to [the Bond Act] may not exceed the lesser of (1) the sum of two billion dollars ($2,000,000,000); or (2) the amount which, when added to all anticipated interest and related costs of the bonds, does not exceed the anticipated reduction of the state's pension obligations as a result of changes in the retirement law that reduce contributions to the retirement system, as determined by the Director of Finance." (§ 16947, subd. (a).) In addition, the cumulative amount of bonds issued in any one fiscal year "may not exceed the total unpaid amount of the state's pension obligations for that fiscal year." (§ 16947, subd. (b).)

The proceeds of any bonds issued under the Bond Act "shall be applied to the funding or refunding of pension obligations, or refunding of bonds previously issued" or "the prepayment of pension obligations." (§ 16949.)

"In the discretion of the [C]ommittee, any bonds issued under [the Bond Act] may be secured by a trust agreement, indenture, or resolution between the state and any trustee, which may be the Treasurer or any trust company or bank having the powers of a trust company chartered under the laws of any state or the United States and designated by the Treasurer. . . ." (§ 16952.)

On October 14, 2004, the chief deputy director of finance (Deputy Director), on behalf of the Director of Finance, requested the Committee to authorize the issuance of bonds in the amount of $960 million to pay a portion of the State's employer contribution to PERS for fiscal year 2004–2005. The Deputy Director determined that changes to the Retirement Law adopted in the pension reform legislation described above are anticipated to reduce the State's employer contributions to PERS by in excess of $2,881,000,000 over the next 20 years and it is in the best interest of the State to accelerate these savings by issuing bonds. This estimated savings was later revised downward to $1,678,000,000.

On October 20, 2004, the PERS Board determined the State's employer contribution for fiscal year 2004–2005 was $1,910,523,132.

The following day, October 21, 2004, the Committee adopted resolution No. 2004-1, authorizing the issuance of bonds under the Bond Act to pay a portion of the State's pension obligation. Resolution No. 2004-1 provides that the amount of bonds authorized may not exceed the lesser of (1) the unpaid amount of the State's employer pension obligation for the fiscal year,

(2) $960 million, or (3) "the amount which, when added to all anticipated interest and related costs of the Bonds, does not exceed the amount of the anticipated reduction of the State's pension obligations as a result of changes in the Retirement Law . . . ."

Resolution No. 2004-1 also presented a form trust agreement to be entered into between the Committee and the State Treasurer (the Trust Agreement). Pursuant to the Trust Agreement, all proceeds from the sale of bonds under resolution No. 2004-1 will be deposited in the pension obligation bond fund and disbursed to PERS to meet the State's employer contribution requirement.

## IV

### *The Present Action*

On October 22, 2004, the Committee filed the present action seeking a determination of the legality of resolution No. 2004-1. The trial court issued an order of publication, and the Committee complied with that order.

Fullerton Association of Concerned Taxpayers (FACT) is an unincorporated association dedicated to promoting sound and prudent policies of government taxing and spending. On December 9, 2004, FACT filed a verified answer to the complaint.

Following a hearing on the Committee's claims, the trial court issued a tentative decision in favor of FACT, concluding the issuance of bonds under resolution No. 2004-1 will violate article XVI, section 1. The court later confirmed its tentative decision and, on November 30, 2005, entered judgment for FACT.

The Committee appeals.

### DISCUSSION

### I

### *Introduction*

██ Code of Civil Procedure section 860 authorizes a public agency to bring an action to determine the validity of certain public agency bonds, assessments, contracts with other agencies, or the public agency itself. (*Walters v. County of Plumas* (1976) 61 Cal.App.3d 460, 466 [132 Cal.Rptr.

174].) Within their proper scope, such validation actions serve an important function in eliminating legal uncertainty that could impair a public agency's ability to operate, market bonds, or the like. (*Id.* at p. 468.)

The present matter involves the validity of bonds proposed to be issued by the Committee pursuant to the Bond Act in order to finance a portion of the State's employer contributions to PERS. The question presented is whether the legislation authorizing these bonds violates the state Constitution.

Article XVI, section 1 reads, in relevant part: "The Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars ($300,000), except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work . . . ; but no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election . . . ."

■ This provision prohibits the state Legislature from creating any indebtedness greater than $300,000 unless that indebtedness has been approved by a two-thirds vote of the Legislature and a majority vote of the people.

In the present matter, it is undisputed the Bond Act was not approved by a two-thirds vote of the Legislature or a majority of the people and the bonds proposed to be issued under resolution No. 2004-1 will exceed $300,000 in value. The sole issue litigated by the parties in this validation action is whether the bonds proposed to be issued fall within an exception to article XVI, section 1 for obligations imposed by law. As we shall explain, we conclude no such exception applies under the circumstances presented.

## II

### *Article XVI, Section 18*

■ Article XVI, section 1 limits the state Legislature's ability to incur debt. A similar restriction applies to local governments. Article XVI, section 18, subdivision (a) reads, in relevant part: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose . . . ."

The underlying purpose for the foregoing provision was to put an end to the practice common at the time among local governments of incurring liabilities in excess of income in order to finance extravagance, thereby creating a floating debt to be repaid from the income of future years. (*City of Long Beach v. Lisenby* (1919) 180 Cal. 52, 56 [179 P. 198] (*Lisenby*); *San Francisco Gas Co. v. Brickwedel* (1882) 62 Cal. 641, 642.) As such, the provision is more accurately viewed as a balanced budget requirement than a debt limit. (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1045 [77 Cal.Rptr.2d 189, 959 P.2d 347].)

Three exceptions have been recognized to the local debt limit of article XVI, section 18. One exception applies whenever debts are incurred that will be repaid from revenues held in a special fund. (*Rider v. City of San Diego, supra*, 18 Cal.4th at p. 1045.) For example, in *San Francisco S. Co. v. Contra Costa Co.* (1929) 207 Cal. 1 [276 P. 570], the state high court found the debt limit inapplicable where the county issued bonds for the improvement of streets and the bonds were to be repaid through special assessments on the properties benefiting from the improvements. (*Id.* at pp. 4–5.) In effect, because the bonds were to be repaid from this special fund rather than the general fund, no debt had been incurred.

In *City of Oxnard v. Dale* (1955) 45 Cal.2d 729 [290 P.2d 859], the high court clarified that a debt repayable from a special fund is not a debt within the meaning of article XVI, section 18 only if the governmental body is not required to maintain the special fund from its general fund or through the exercise of its taxing powers. (45 Cal.2d at p. 737.)

Another exception to article XVI, section 18 applies where the local government enters into a contingent obligation. "A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens." (*Doland v. Clark* (1904) 143 Cal. 176, 181 [76 P. 958].) This exception has been applied to uphold multiyear contracts, such as leases, in which local governments agree to pay a sum in each of succeeding years in exchange for land, goods, or services to be provided during those years. (*Rider v. City of San Diego, supra*, 18 Cal.4th at p. 1047.)

For example, in *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 [122 P.2d 14], the city entered into an agreement for the construction and leasing to the city of a rubbish incinerator. The court found this to be outside the scope of article XVI, section 18, explaining: "It has been held generally in the numerous cases that have come before this court involving leases and agreements containing options to purchase that if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines

liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision." (19 Cal.2d at pp. 485–486.)

The third exception, and the one at issue here, applies to obligations imposed by law. In *Lewis v. Widber* (1893) 99 Cal. 412 [33 P. 1128], the state high court concluded an obligation to pay the salary of a county treasurer was exempt from the local debt limit because the office was mandated by state law. (*Id.* at p. 415.) According to the court, article XVI, section 18 "refers only to an indebtedness or liability which one of the municipal bodies mentioned has itself incurred—that is, an indebtedness which the municipality has contracted, or a liability resulting, in whole or in part, from some act or conduct of such municipality. Such is the plain meaning of the language used. The clear intent expressed in the said clause was to limit and restrict the power of the municipality as to any indebtedness or liability which it has discretion to incur or not incur. But the stated salary of a public officer fixed by statute is a matter over which the municipality has no control, and with respect to which it has no discretion; and the payment of his salary is a liability established by the legislature at the date of the creation of the office. It, therefore, is not an indebtedness or liability incurred by the municipality within the meaning of said clause of the constitution." (99 Cal. at p. 413.)

In *County of Los Angeles v. Byram* (1951) 36 Cal.2d 694 [227 P.2d 4], the high court held the cost of constructing a courthouse was not subject to the constitutional debt limit, because the county had a legal duty, imposed by state law, to provide "adequate quarters" for the courts. (*Id.* at p. 699.) This duty was enough to take the matter outside the constitutional debt limit, even though the county retained wide discretion regarding what kind of courthouse to construct and at what cost.

In order for state law to impose a nondiscretionary duty on a local governmental entity within the meaning of this exception, the state law must do more than impose a general duty to perform some function. It must impose a special duty on the entity to expend its money on that function. (*Compton Community College etc. Teachers v. Compton Community College Dist.* (1985) 165 Cal.App.3d 82, 91 [211 Cal.Rptr. 231].) Thus, in *Arthur v. City of Petaluma* (1917) 175 Cal. 216 [165 P. 698], the court concluded a debt incurred to print a city charter did not fall within the exception to the constitutional debt limit for obligations imposed by law. Although state law required a city to print its charter in a local newspaper for 20 days whenever it chose to adopt a charter, the city's decision to adopt a charter was itself discretionary. In other words, the obligation to pay the printing charge came about only because the city voluntarily chose to adopt the charter. Hence, this was not an obligation imposed by law.

## III

### *Does the Exception for Obligations Imposed by Law Apply to Article XVI, Section 1?*

The Committee contends "debt" within the meaning of article XVI, section 1, the state debt limit, should be interpreted the same as in article XVI, section 18, the local debt limit, and should be subject to the same exceptions.

In *Dean v. Kuchel* (1950) 35 Cal.2d 444 [218 P.2d 521], our Supreme Court applied the contingency exception of article XVI, section 18 to article XVI, section 1. There, the state leased land to a developer under an arrangement whereby the developer was to construct a building on the land and lease the building to the state for a period of 25 years. The court concluded this arrangement did not create a debt within the meaning of article XVI, section 1, because, as in *City of Los Angeles v. Offner, supra,* 19 Cal.2d 483, the payment of rent in future years was contingent on continued availability of the building in those years. The court indicated "the same principles apply to both constitutional provisions." (*Dean v. Kuchel, supra,* at p. 446.)

In *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575 [131 Cal.Rptr. 361, 551 P.2d 1193], the court applied the special fund exception to article XVI, section 1. There, state law authorized the issuance of bonds to pay for low-income housing, with the bonds to be repaid using revenues generated from the housing or, if necessary, a reserve fund appropriated at the time the law was enacted. Citing *City of Oxnard v. Dale, supra,* 45 Cal.2d 729, the court concluded no debt had been created by this arrangement within the meaning of article XVI, section 1, because neither the general fund nor the state's taxing authority was implicated. (*California Housing Finance Agency v. Elliott, supra,* at p. 587.)

The Committee cites no case in which the exception to article XVI, section 18 for obligations imposed by law has been applied to article XVI, section 1. We have not been able to find any either.

FACT contends it is not surprising no reported case has applied this exception to article XVI, section 1. FACT argues such exception "logically applies only in the context of lower levels of government" where "the government is constrained to make a certain expenditure by legal mandates from above." According to FACT, this exception "does not fit logically with the nature of state government, while it is precisely applicable to local government." FACT further argues that, because article XVI, section 1 contains express exceptions, this court is precluded from creating new ones.

█ FACT's arguments read the exception for obligations imposed by law too narrowly. Even assuming there is no higher governmental authority, such as the federal government or international law, that could impose a financial obligation on the state, the exception is not limited to government-imposed obligations. As the state high court explained in *Lewis v. Widber, supra,* 99 Cal. at page 413, the purpose of the local debt limit is to "restrict the power of the municipality as to any indebtedness or liability which it has discretion to incur or not to incur." In *Lisenby, supra,* 180 Cal. 52, the city issued bonds to pay tort judgments that had been entered against it. Although the aggregate amount of the bonds exceeded the city's income for the year, the court concluded the local debt limit did not apply, because this was not an obligation voluntarily incurred by the city. (*Id.* at pp. 57–58.)

The same purpose underlies the state debt limit of article XVI, section 1—to restrict the power of the state Legislature to incur debt *voluntarily.* Consequently, it may be argued that a debt incurred involuntarily, such as one to satisfy a tort judgment against the state, would be outside the scope of article XVI, section 1. Furthermore, it may be noted that all of the exceptions recognized under article XVI, section 18 are just restatements of the general principle that the local debt limit applies only in circumstances where the governmental entity has *created* a *debt.* The contingency exception applies because no debt is created until the contingency occurs. The special fund exception applies because no debt has been established, inasmuch as the obligation will be repaid from the earnings of the project and not the general fund. The exception for obligations imposed by law applies because a debt already exists and, hence, has not been created. Because article XVI, section 1, like article XVI, section 18, limits the power of the governmental entity to create debt, that limitation should not apply if no debt has been created.

At any rate, it is unnecessary to decide here if the exception for obligations imposed by law applies to article XVI, section 1. As we shall explain in the next section, the legislation at issue here does not fall within the scope of such an exception.

## IV

### *Does the Exception Apply Here?*

The Committee contends that, because the amount of the State's contribution to PERS is within the sole discretion of the PERS Board, and the Legislature has no choice but to fund at the level dictated by the board, "the obligation to pay the pension obligation at issue in this action constitutes an obligation imposed by law." The Committee cites as support Proposition 162,

the California Pension Protection Act of 1992, which, as briefly described above, added to article XVI, section 17 the following provisions:

"(a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system. [¶] . . . [¶]

"(e) The retirement board of a public pension or retirement system, consistent with the exclusive fiduciary responsibilities vested in it, shall have the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system."

The Committee argues that, through Proposition 162, "the voters created a unique constitutionally-sanctioned state employer pension obligation with which neither the Legislature nor the Governor can tamper" and, therefore, the pension obligation is "an 'obligation imposed by law.' "

The Committee further cites section 20831, which reads: "Notwithstanding any other provision of law, neither the state, any school employer, nor any contracting agency shall fail or refuse to pay the employers' contribution required by this chapter or to pay the employers' contributions required by this chapter within the applicable time limitations."

Finally, the Committee cites section 16912, where the Legislature declared: "[T]he state's obligations to make payments to certain public retirement systems are obligations imposed by law not subject to Section 1 of Article XVI . . . ."

The trial court rejected the Committee's arguments, explaining: "Plaintiff attempts to bring this case within the reach of the local government cases by arguing that pension obligations have been 'imposed upon' the State by the Public Employees Retirement System acting as the actuary for the state pension system under the authority granted to it by the State Constitution in Article [XVI], section 17. The Court finds this argument to be unpersuasive, as it is based on an artificial distinction in status between enactments of the Legislature and those of the voters, in which the latter are somehow viewed

as separate from, and superior to, the former. Such a view is not in harmony with the concept of the State's legislative power as set forth in the Constitution. Article [II], section 1 of the Constitution states the basic concept that all political power is inherent in the people. Article [IV], section 1 states that the legislative power of the State is vested in the Legislature, but the people reserve to themselves the powers of initiative and referendum. Under Article [II], section 8(a), initiative is the power of the electors to propose and adopt or reject statutes and amendments to the State Constitution. Thus, statutes enacted by the Legislature and statutes and constitutional provisions enacted by the electorate through the initiative process are equally exercises of the legislative power of the State. Accordingly, the pension obligations of the State, whether created by the Legislature through statute or by the people enacting constitutional provisions through the initiative process, both ultimately derive from the legislative power of the State. In essence, the State has chosen to impose pension obligations upon itself, which is inconsistent with the concept of an 'obligation imposed by law' by a separate and higher legal authority, as that concept has been set forth in the case law."

The Committee contends the trial court's analysis is flawed because it fails to recognize the fundamental limit on article XVI, section 1—that it expressly applies only to actions of the Legislature, not the people. In this way, article XVI, section 1 differs from article XVI, section 18. The latter applies to any action of the local government, not just its legislative body.

The Committee argues article XVI, section 1 does not restrict the power of the *people* to adopt legislation or amend the state Constitution and thereby create binding obligations. The Committee asserts the people represent "a separate and higher power to the Legislature." According to the Committee, once the people have created such an obligation, it is one *imposed by law*, and the Legislature is not prohibited by article XVI, section 1 from incurring debt to satisfy that obligation. The Committee asserts the people "authorized the creation of a pension system" in 1930. The Committee further asserts the people created a binding obligation to fund the system "when they empowered the [PERS] Board to determine how much the State must pay in any given year."

The Committee argues the trial court also ignored the difference between statutory and constitutional provisions. According to the Committee, the state Constitution is "a separate and higher power" and "the constitutional empowerment of the [PERS] Board to determine the amount of the State's annual employer contribution acts to create an obligation imposed by law."

Finally, the Committee argues the issuance of bonds under the Bond Act is not the creation of a debt within the meaning of article XVI, section 1 but the

conversion of a preexisting debt—the obligation to fund the various retirement plans—into another form.

FACT counters that the language of article XVI, section 1 is clear and prohibits the creation of any debt greater than $300,000 without voter approval. FACT further argues there can be no doubt the bonds proposed to be issued under the Bond Act are a debt subject to the constitutional debt limit.

However, the question here is not whether the bonds represent a debt as that term is commonly understood. The question, as posited by the Committee, is whether the debt represented by the bonds already existed by virtue of the state's obligation to fund pension benefits, such that issuance of the bonds is not the creation of a debt but a change in the form of a preexisting indebtedness.

■ FACT argues the Committee's reliance on section 16912, where the Legislature declared the obligation to make payments to public retirement systems is an obligation imposed by law, is misplaced. We agree. A legislative declaration that essentially states a given enactment is constitutional is not binding on the courts. (*McClure v. Nye* (1913) 22 Cal.App. 248, 252 [133 P. 1145].) "The question before us is simply one of construction or interpretation of an act of the [L]egislature and of a provision of the [C]onstitution, and that is a judicial question." (*Ibid.*)

FACT argues recognition of an exception to the debt limit under the circumstances presented here, where the state Constitution does not expressly require pension contributions, would effectively "devour" the debt limitation. According to FACT, the exception would likewise apply to debt incurred to fund constitutionally established state agencies, the executive branch, the judicial branch, the civil service, state educational institutions, and the Legislature itself. In effect, FACT argues, government debt could be created without voter approval "for a wide range of the regular costs of government."

However, this does not mean a financial obligation adopted by the people through the power of initiative necessarily creates an obligation imposed by law within the meaning of the exception to article XVI, section 1. But we need not decide that issue here. Assuming this to be so, neither the 1930 authorization to create a pension system nor the California Pension Protection Act of 1992 created an obligation to fund retirement benefits. The 1930 authorization was just that, an authorization. It did not bind the Legislature to create a pension system and, a fortiori, did not bind the Legislature to fund such a system.

■ The provisions of the California Pension Protection Act of 1992 grant to "the retirement board of a public pension or retirement system" plenary

authority over "investment of moneys and administration of the [retirement] system." (Art. XVI, § 17.) They also give such retirement board "sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system" and "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services . . . ." (Art. XVI, § 17, subd. (a).) Finally, the retirement board is given "sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system." (Art. XVI, § 17, subd. (e).)

Nothing in the foregoing requires the Legislature to fund the retirement system. It does no more than grant the PERS Board, and similar retirement boards, power to control the assets invested in the retirement system. Although the provisions give the PERS Board actuarial authority, they do not require funding in accordance with the board's calculations. That requirement comes from section 20790 et sequitur.

We also need not decide if a financial obligation originating in the state Constitution can create an obligation imposed by law within the meaning of the exception to the constitutional debt limit. Except for article XVI, section 17, the Committee cites nothing in the state Constitution that imposes an obligation on the Legislature to fund the retirement system.

As concluded by the trial court, the obligation to fund pension benefits is essentially an obligation imposed by the Legislature on itself. This is not changed by the fact that the obligation has existed for over 75 years. The Legislature retains the power to eliminate or amend the obligation, as it did in the 2004 pension reform legislation described above.

The Committee cites as contrary authority our decision in *Valdes, supra,* 139 Cal.App.3d 773. In that case, we concluded balanced budget legislation unilaterally cancelling otherwise continuously appropriated employer contributions to pension systems interfered with the vested contractual rights of PERS members. The legislation in question prohibited the payment of previously appropriated state employer contributions to the Public Employees' Retirement Fund for the last three months of the fiscal year and reversion of those contributions to the general fund. (*Id.* at pp. 777–778.) It also required the PERS Board to transfer an amount equal to the state employer contribution from the reserve portion of the Public Employees' Retirement Fund. (*Id.* at p. 778.)

Regarding the nature of the pension rights at issue, we noted: "While some jurisdictions view public employees' retirement rights as a gratuity (see cases collected in Annot., 52 A.L.R.2d 437), a long line of California decisions

establishes that 'A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity.' " (*Valdes, supra,* 139 Cal.App.3d at pp. 783–784.) We concluded: "[T]he state and other public employers are contractually bound in a constitutional sense to pay the withheld appropriations to the PERS fund. The explicit language in the retirement law constitutes a contractual obligation on the part of the state as employer to abide by its 'continuing obligation' [citation] to make the statutorily set payment of monthly contributions to PERS unless and until such time as the board *or* the Legislature, after due consideration of the actuarial recommendations by the board, deems such contributions inappropriate." (*Id.* at p. 787.)

Our decision in *Valdes* does not assist the Committee. The fact that the state has a contractual obligation to maintain pension benefits does not mean the obligation is one imposed on the state by law. Rather, as explained above, it is an obligation the Legislature has imposed on itself.

The Committee asserts California case law "conclusively supports" the Legislature's finding and declaration in section 16942 that the pension obligations at issue here are "imposed by law, and not subject to Section 1 of Article XVI of the California Constitution and that the bonds authorized to be issued under this chapter have the same character under the Constitution as the pension obligations funded or refunded." (§ 16942.) The Committee cites *City of Los Angeles v. Teed* (1896) 112 Cal. 319 [44 P. 580] (*Teed*) and *Lisenby, supra,* 180 Cal. 52.

In *Teed,* the city council enacted an ordinance providing for the issuance of bonds to raise money to refund other bonds that were coming due. (*Teed, supra,* 112 Cal. at p. 324.) On the defendant's argument that the new bonds conflicted with the predecessor to article XVI, section 18 because they did not provide for the consent of the voters, the court concluded: "[W]e do not think there is any such conflict. It is true that the sections in question do not provide for obtaining the assent of the voters, but no such assent was necessary. The only indebtedness authorized by these provisions to be funded or refunded is such as existed prior to the time when the constitutional provision in question took effect; and merely to fund or refund an existing debt is not to 'incur an indebtedness or liability.' " (*Teed, supra,* at pp. 326–327.)

In *Lisenby,* as previously described, the city issued bonds to pay tort judgments that had been entered against it and the court concluded the local debt limit did not apply, because this was not an obligation voluntarily

incurred by the city. (*Lisenby, supra,* 180 Cal. at pp. 57–58.) Again, the debt already existed and the bonds were issued to pay it. In effect, the debt represented by the tort judgments was converted to a debt represented by the bond obligations.

The Committee's reliance on *Teed* and *Lisenby* is misplaced. In *Teed,* the debt already existed in the form of bonds issued *before* enactment of the constitutional debt limit. Thus, it did not matter if the original debt was voluntarily incurred. No new debt was created by issuance of replacement bonds. In *Lisenby,* the tort debt already existed at the time of issuance of bonds to pay it and this original obligation had not been *voluntarily* incurred. Issuance of bonds was merely conversion of this involuntary debt from one form to another.

■ In the present matter, the state has an obligation to fund pension benefits. However, this is an obligation voluntarily undertaken by the Legislature. Furthermore, the continuing obligation to fund such benefits is subject to additional legislative action. (See *Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863–864 [148 Cal.Rptr. 158, 582 P.2d 614].) As such, it is a matter at least in part subject to legislative discretion and not one imposed by law.

V

*Conclusion*

The Bond Act authorizes the issuance of bonds under certain limited circumstances in order to raise money to pay a portion of the state's annual employer contribution to PERS. Pursuant to the Bond Act, the Committee adopted resolution No. 2004-1, authorizing the issuance of $960 million in bonds to pay a portion of the State's employer contribution to PERS for fiscal year 2004–2005.

■ The amount of the bonds proposed to be issued under the Bond Act exceeds the threshold of article XVI, section 1. However, those bonds were not approved by a two-thirds vote of the Legislature or a majority vote of the people, as required by that constitutional provision.

The Committee asserts the bonds fall within an exception to the constitutional debt limit for obligations imposed by law.

We have concluded that, to the extent such an exception applies generally to article XVI, section 1, it does not apply here, because the State's obligation

to fund PERS is one the Legislature voluntarily imposed upon itself. Therefore, we conclude the trial court correctly ruled against the Committee in this validation action.

## DISPOSITION

The judgment is affirmed. FACT is awarded its costs on appeal.

Scotland, P. J., and Blease, J., concurred.