[No. C057542. Third Dist. Mar. 24, 2009.]

TAXPAYERS FOR IMPROVING PUBLIC SAFETY et al., Plaintiffs and Appellants, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents.

754

## Counsel

Sanders & Associates and Steve Sanders for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Stephen P. Acquisto, Jason E. Rios and Seth E. Goldstein, Deputy Attorneys General, for Defendants and Respondents.

## Opinion

**HULL, J.**—In response to severe overcrowding in the state's prison system, the Legislature enacted Assembly Bill No. 900 (2007–2008 Reg. Sess.), the Public Safety and Offender Rehabilitation Services Act of 2007 (Assembly Bill 900 or the Act), authorizing the State Public Works Board (board) to issue up to approximately $7.4 billion in bonds for the construction and renovation of prisons to be operated by California's Department of Corrections and Rehabilitation (CDCR).

Plaintiffs, Taxpayers for Improving Public Safety, Gail Brown, and Matt Gray, initiated this taxpayer lawsuit against Arnold Schwarzenegger, in his capacity as the Governor of California, James Tilton, in his capacity as the Secretary of the CDCR, and John Chiang, in his capacity as the State Controller, asking for declaratory and injunctive relief to bar implementation of Assembly Bill 900. Plaintiffs allege the proposed bonds will violate article XVI, section 1 of the California Constitution (article XVI, section 1 or the state debt limit), which prohibits the Legislature from creating any debt that exceeds an allowable maximum without obtaining a two-thirds vote of the Legislature and a majority vote of the people.

Defendants demurred to the complaint, and the trial court sustained the demurrers without leave to amend. The court concluded that, because bonds issued by the board under Assembly Bill 900 will be repayable solely from a special fund maintained through lease payments received by the board from CDCR, no *debt* will be created within the meaning of the state debt limit.

Plaintiffs contend the trial court erred, because (1) a declaratory relief claim is not subject to demurrer; (2) the complaint states a claim under article XVI, section 1; and (3) they should have been granted leave to amend in order to present evidence supporting their claim.

We conclude that, while plaintiffs' declaratory relief claim may not have been subject to demurrer, we may nevertheless resolve the legal issue presented by that claim.

We further conclude defendants' demurrers to the complaint were properly sustained. The underlying purpose of the state debt limit is to force government to operate within its means. Consistent with this purpose, the courts have carved out a number of "exceptions," including one where the state undertakes an obligation to make periodic payments that are contingent on the future use or availability of property, goods, or services. The most common example of this contingency exception is where the state enters into a long-term lease of property and future lease payments are contingent on future availability of the property.

■ Because plaintiffs have mounted a facial challenge to the Act, it must be upheld if there is any way the Act may be implemented that would not violate the state debt limit. As we shall explain, we conclude the Act may be implemented in such a way as to fall within the contingency exception. The Act provides for the construction of prison facilities financed by bonds to be repaid from the state's general fund. Those bonds may be structured in such a way that future periodic payments are contingent on future use or availability of the facilities. Hence, the state has not undertaken an obligation that offends the pay-as-you-go principle underlying the state debt limit.

Finally, we conclude defendants' demurrers were properly sustained without leave to amend because a demurrer tests the adequacy of the complaint's allegations, not whether plaintiffs can produce evidence to support those allegations. We therefore affirm the judgment of dismissal.

FACTS AND PROCEEDINGS

Overcrowded prisons are nothing new to California. In 1985, 47,082 state prisoners were housed in facilities designed to hold only 29,042. (Carlin, *Chapter 252: Helping to Manage California's Overcrowded Jails* (2008) 39 McGeorge L.Rev. 602, 603, fn. 8.) By 2007, the prison population had increased to approximately 173,000, while the prison capacity had grown to only half that amount. (Muradyan, *Government: California's Response to Its Prison Overcrowding Crisis* (2008) 39 McGeorge L.Rev. 482, 485.) It has been suggested this increase in prison population has been due to several factors, including enactment of the determinate sentencing law, which tended to increase terms for most offenses, the three strikes law, and the state's parole and rehabilitation systems. (Muradyan, at pp. 485–487.) Prison overcrowding has prompted federal class action lawsuits attacking the adequacy of medical and mental health care provided by CDCR. (See *id.* at pp. 487–488.) On February 14, 2006, in *Plata v. Schwarzenegger*, No. C01-1351 TEH, the United States District Court for the Northern District of California took the drastic step of appointing a receiver to take control of the delivery of medical care within the state's prisons. (We grant defendants'

request for judicial notice of the federal court's February 14 order, attached as exhibit B to defendants' May 27, 2008 request for judicial notice. We also grant defendants' request for judicial notice of exhibits C and D, which are federal court orders convening a three-judge panel to consider the release of prisoners as a remedy for overcrowding. The trial court previously took judicial notice of each of these items. (See Evid. Code, § 459, subd. (a)(1).))

To address the prison overcrowding problem, the Governor called a special session of the Legislature in the summer of 2006. However, this failed to produce any meaningful improvements. (*California Correctional Peace Officers Assn. v. Schwarzenegger* (2008) 163 Cal.App.4th 802, 809 [77 Cal.Rptr.3d 844].) On October 4, 2006, the Governor issued a proclamation directing the CDCR to mitigate overcrowding in 29 state prisons by transferring inmates to out-of-state correctional facilities. (We grant defendants' request for judicial notice of this proclamation, attached as exhibit A to defendants' request for judicial notice. The trial court previously took judicial notice of this item as well.) The proclamation said there were more than 15,000 inmates being housed in areas of the indicated prisons that were "never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms," thereby posing substantial health and safety risks to both inmates and prison employees. According to the proclamation, "in addition to the 1,671 incidents of violence perpetrated in these 29 severely overcrowded prisons by inmates against CDCR staff last year, and the 2,642 incidents of violence perpetrated in these prisons on inmates by other inmates in the last year, the suicide rate in these 29 prisons is approaching an average of one per week . . . ."

The following year, the Legislature enacted Assembly Bill 900. The Act adds two chapters to part 10b, division 3, title 2 of the Government Code, the State Building Construction Act of 1955 (the State Building Construction Act or SBCA) (Gov. Code, § 15800 et seq.; further undesignated section references are to the Government Code). As recently amended by Senate Bill No. 14 (2009–2010 Reg. Sess.), Assembly Bill 900 authorizes CDCR to design, construct, or renovate housing units, support buildings, and programming space at new or existing prisons to accommodate an additional 12,000 beds; to design, construct and renovate reentry program facilities to house 6,000 inmates; and to design, construct and establish new buildings at facilities to provide medical, dental, and mental health treatment or housing for 6,000 inmates. (§ 15819.40, added by Stats. 2007, ch. 7, § 2, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 1.) It also authorizes CDCR, the board, and participating counties to acquire, design and construct local jail facilities. (§ 15820.901, added by Stats. 2007, ch. 7, § 4.) The Act requires CDCR to implement a system of incentives to increase inmate participation in academic and vocational education (Pen. Code, § 2054.2, added by Stats. 2007, ch. 7, § 6), to develop and implement a plan to obtain additional rehabilitation and

treatment services (Pen. Code, § 2062, added by Stats. 2007, ch. 7, § 8), to expand substance abuse treatment services to accommodate at least 4,000 additional inmates (Pen. Code, § 2694, added by Stats. 2007, ch. 7, § 10), to develop an inmate treatment and prison-to-employment plan (Pen. Code, § 3105, added by Stats. 2007, ch. 7, § 13), and to implement a plan to address management deficiencies within CDCR (Pen. Code, § 2061, added by Stats. 2007, ch. 7, § 7). Finally, the Act authorizes the board to issue revenue bonds to finance the foregoing. (Gov. Code, §§ 15819.403, subd. (a), 15819.413, subd. (a), 15820.903, subd. (a), 15820.913, subd. (a), added by Stats. 2007, ch. 7, §§ 2–5, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, §§ 2, 9, 12.)

Plaintiffs initiated this action seeking to prevent implementation of the Act. As noted, the complaint contains two causes of action, one asking for declaratory relief and one asking for an injunction. Plaintiffs allege defendants "seek to sell revenue bonds for the purpose of constructing prisons and jail cells in California . . . ." They further allege a present controversy exists between them and defendants, in that plaintiffs contend issuance of the bonds would violate article XVI, section 1, whereas defendants contend they are entitled to issue such bonds under exceptions to the state debt limit.

Plaintiffs moved for a preliminary injunction, but their motion was denied. Defendants then demurred to the complaint on the ground that it fails to state a claim.

The trial court sustained the demurrers without leave to amend. The court concluded that only obligations that are legally enforceable against the state's general fund or taxing power are covered by the constitutional debt limit, and bonds issued under the Act would not be legally enforceable against the state's general fund but only against rent payments received from CDCR. Plaintiffs appeal from the ensuing judgment of dismissal.

DISCUSSION

I

*The Legal Framework*

A. *Overview of the Constitutional Debt Limits*

To aid in analyzing the Act and addressing the contentions of the parties, we first discuss the legal framework under which Assembly Bill 900 was enacted.

The California Constitution contains two general constraints on borrowing to finance governmental activities. Article XVI, section 18 of the California

Constitution (sometimes referred to as the local debt limit) applies to local governments. (Further references to articles are to the California Constitution.) It reads in relevant part: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose . . . ." The counterpart for state government is article XVI, section 1. It reads in relevant part: "The Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars ($300,000), except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work . . . ; but no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election . . . ."

The underlying purpose of these debt limits is to force government to operate within its means. (*State ex rel. Pension Obligation Bond Com. v. All Persons Interested etc.* (2007) 152 Cal.App.4th 1386, 1398 [62 Cal.Rptr.3d 364] (*Pension Obligation*); *Pooled Money Investment Bd. v. Unruh* (1984) 153 Cal.App.3d 155, 160 [200 Cal.Rptr. 500].) Hence, they have been viewed more accurately as balanced budget requirements than debt limits. (*Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1045 [77 Cal.Rptr.2d 189, 959 P.2d 347] (*Rider II*); *Pension Obligation*, at p. 1398.) As explained by the state Supreme Court more than 150 years ago: "The power of taxation was given to the Legislature, without limit, for all purposes allowed by the Constitution, and the framers of that instrument knew that it was not the practice of governments, well conducted, to borrow money for the ordinary expenses of government. These expenses are regular and certain, and can easily be provided for by taxation. In reference to such expenses, there is no cause for surprise upon the Legislature. It is easy to anticipate their amount with a reasonable degree of certainty, and the framers of the Constitution knew that if they permitted the Legislature to borrow money to defray the ordinary expenses of the government, it would not be long before the State must be brought practically to rely upon the yearly revenue; for the reason, that a yearly deficit of the revenue would soon destroy the credit of the State, so that she could not borrow for any such purpose. A family, or State, that borrows to pay ordinary expenses, must soon have no power to borrow; and as the State, from the very nature of the case, must sooner or later come to

the point of 'paying as you go,' it was wise in the framers of our Constitution, to bring her to it at an early period." (*Nougues v. Douglass* (1857) 7 Cal. 65, 68.)

■ Consistent with the underlying purpose of the constitutional debt limits, the courts have carved out a number of "exceptions." Although, in each instance, the so-called "exception" is fundamentally a recognition that the transaction or legislation in question does not create a "debt" owed by the governmental entity within the meaning of the debt limit provisions, but is instead a payment arrangement that falls entirely outside of those provisions, we will refer to them as "exceptions" as others have done before us. In any event, as a general rule, such a debt subject to debt limitations arises only if a financial obligation is created that must be satisfied from the governmental entity's general funds or taxing power. (*City of Oxnard v. Dale* (1955) 45 Cal.2d 729, 737 [290 P.2d 859].)

For example, in *San Francisco S. Co. v. Contra Costa Co.* (1929) 207 Cal. 1 [276 P. 570], the state high court found the local debt limit inapplicable where the county issued bonds for the improvement of streets and the bonds were to be repaid through special assessments on the properties benefiting from the improvements. (*Id.* at pp. 4–5.) Because the bonds were to be repaid from this special fund rather than the county's general fund, no prohibited debt had been created.

In *California Educational Facilities Authority v. Priest* (1974) 12 Cal.3d 593 [116 Cal.Rptr. 361, 526 P.2d 513], the high court applied this special fund exception to the state debt limit. There, legislation created the California Educational Facilities Authority for the purpose of issuing revenue bonds to provide funding for expansion by institutions of higher education. The legislation authorized the authority to acquire land and construct or rehabilitate facilities and to lease those facilities to the educational institutions. The bonds were to be repaid solely from the lease payments; the authority was given no power to tax or appropriate public funds for this purpose. (*Id.* at pp. 596–597.) The high court concluded that, because the bonds were to be repaid solely from a special fund maintained from lease payments, no state debt had been created. (*Id.* at p. 607.)

■ Another exception to the constitutional debt limits has been recognized where the governmental entity enters into a contingent obligation. "A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens." (*Doland v. Clark* (1904) 143 Cal. 176, 181 [76 P. 958].) This contingency exception has been applied to uphold multiyear contracts, such as leases, where the governmental entity agrees to pay sums in succeeding periods in exchange for property, goods, or services to be

provided during those periods. (*Pension Obligation, supra*, 152 Cal.App.4th at p. 1398.) Each periodic payment is viewed as a contemporaneous payment for the property, goods, or services received rather than an installment payment on a long-term debt.

For example, in *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 [122 P.2d 14] (*Offner*), the city proposed to enter into an agreement whereby the city would lease real property to a private entity for 10 years and the private entity would construct an incinerator on the property and lease the property and the incinerator back to the city. The agreement further provided the city with an option to purchase the incinerator at various intervals during the lease. (*Id.* at pp. 484–485.)

The Supreme Court rejected a challenge to this transaction under article XI, section 18, explaining: "[I]f the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision." (*Offner, supra*, 19 Cal.2d at p. 486.)

In *Dean v. Kuchel* (1950) 35 Cal.2d 444 [218 P.2d 521] (*Dean*), the high court took *Offner*'s contingency exception one step further, applying it where, at the end of the lease term, title transferred automatically to the governmental entity. In *Dean*, the legislation authorized the state to lease real property to a private entity for up to 40 years under the condition that the entity construct a building or buildings on the property for use by the state and that title to such building pass to the state at the end of the lease term.

The high court rejected a challenge to this scheme under article XVI, section 1. The court said: "We find no logical distinction between the Offner case and the one at bar. It is true that there was an option to purchase in the former rather than a vesting of title at the end of the term in the instant case, but as far as liability is concerned, the state under the instrument here is in a better position, for it gets title without the payment of anything other than the rental. The essence of the Offner rule is that the payments are for a month to month use of the building. Here it is clearly stated that the rentals are for that purpose. There is no substantial or logical difference between the option to purchase in the Offner case and the vesting of title at the end of the term in this case. True, the city was not bound to execute the option and thus pay the purchase price, but it was required to pay the rentals. Here the rentals also must be paid but the state need not pay any more. We are satisfied therefore that the instant transaction qualifies as a lease for the purpose of the debt limitation." (*Dean*, 35 Cal.2d at pp. 447–448.)

■ A third exception to the constitutional debt limits has been recognized for obligations imposed by law. In *Lewis v. Widber* (1893) 99 Cal. 412, 415 [33 P. 1128], the court concluded a county's obligation to pay its treasurer's salary was exempt from the local debt limit because the office was mandated by state law. The court explained the debt limit applies "only to an indebtedness or liability which one of the municipal bodies mentioned has itself incurred—that is, an indebtedness which the municipality has contracted, or a liability resulting, in whole or in part, from some act or conduct of such municipality." (*Id.* at p. 413.) According to the court: "[T]he stated salary of a public officer fixed by statute is a matter over which the municipality has no control, and with respect to which it has no discretion; and the payment of his salary is a liability established by the legislature at the date of the creation of the office. It, therefore, is not an indebtedness or liability incurred by the municipality within the meaning of said clause of the constitution." (*Ibid.*)

In *County of Los Angeles v. Byram* (1951) 36 Cal.2d 694 [227 P.2d 4] (*Byram*), the court held the cost of constructing a courthouse was not subject to the constitutional debt limit, because the county had a legal duty, imposed by state law, to provide "adequate quarters" for the court. (*Id.* at p. 699.) By contrast, in *Arthur v. City of Petaluma* (1917) 175 Cal. 216 [165 P. 698], the court concluded a debt incurred to print a city charter did not fall within the "obligation imposed by law" (*Byram*, at p. 698) exception. Although state law required a city to print its charter in a local newspaper for 20 days whenever it chose to adopt a charter, the city's decision to adopt a charter was itself discretionary. In other words, the obligation to pay the printing charge came about only because the city voluntarily chose to adopt the charter. Hence, this was not an obligation imposed by law. (*Arthur*, at p. 225.)

■ The last exception to the constitutional debt limit involves circumstances where, at the time a debt is created, the governmental entity makes an appropriation to retire the debt. This appropriation exception "provides that an obligation for which an appropriation is made at the time of its creation from existing funds, or reasonably anticipated funds subject to appropriation, is not within the constitutional limitation on indebtedness." (*Pooled Money Investment Bd. v. Unruh, supra,* 153 Cal.App.3d at pp. 160–161.)

For example, in *Riley v. Johnson* (1933) 219 Cal. 513 [27 P.2d 760], the high court upheld the use of interest-bearing warrants in excess of $300,000 to pay expenses at times when there were no unapplied sums in the general fund to pay either the principal or interest on the warrants. However, at the time it authorized this warrant procedure, the Legislature appropriated money to meet these obligations. (*Id.* at pp. 520–521.) According to the court: "It is well settled in this state that revenues may be appropriated in anticipation of their receipt just as effectually as when such revenues are physically in the

treasury. The appropriation of such moneys and the issuance of warrants in anticipation of the receipt of revenues in effect operates in the nature of a cash payment and, therefore, does not create an indebtedness or liability within the meaning of the debt limitation clause." (*Ibid.*) In *Riley v. Johnson* (1936) 6 Cal.2d 529 [58 P.2d 631], the court extended this principle to situations where the warrants were not likely to be paid until sometime during the succeeding fiscal period. (*Id.* at p. 532.)

■ The fundamental principle underlying each of these exceptions is that the constitutional debt limit does not apply so long as no long-term debt has been created in a given year to pay for that year's current expenses where that debt is to be paid from the governmental entity's future general funds. The debt limits are intended to force government to live within its means and not saddle future generations with the cost of current obligations. With this principle in mind, we now turn to the legislation at issue in this matter.

B. *The State Building Construction Act of 1955*

■ In 1955, the Legislature enacted the State Building Construction Act to provide a general method for financing and constructing public buildings. Under the SBCA, no public building may be acquired or constructed unless authorized by a separate act or appropriation. (§ 15801.) Upon such authorization, the board may do any of the following: (1) acquire, in the name of the state, and use any property, and lease any property or interest therein to other state agencies; (2) construct public buildings; (3) contract with other state agencies for the use of real property; (4) collect rent and other charges for use of the public buildings; (5) make contracts and execute instruments necessary for carrying on its business; (6) obtain insurance against loss by fire or other hazards on public buildings and obtain insurance against loss of revenues from any cause whatsoever; (7) issue certificates or revenue bonds to obtain funds to pay the cost of public buildings; and (8) issue negotiable notes to obtain interim funds to pay the cost of public buildings. (§ 15809.)

However, the board "has no power at any time or in any manner to pledge the credit or taxing power of the State or any of its local agencies." (§ 15811.) Section 15830 reads: "The bonds issued to finance the construction of a public building or buildings pursuant to this part shall be special obligations of this state secured solely by the revenues, rentals, or receipts received from the operation of the public building or buildings financed by such bonds. [¶] No bond issued or sold pursuant to this part shall be or become a lien, charge, or liability against the State of California or against its property or funds except to the extent of the pledges expressly made by this part. Every bond issued pursuant to this part shall contain a recital on the face thereof stating that neither the payment of the principal nor any part thereof,

nor any interest thereon, constitutes a debt, liability, or general obligation of the State of California other than as provided in this part. The board has no power at any time or in any manner to pledge the credit or taxing power of the state, other than as provided in this part."

■ Once all bonds or other certificates issued by the board under the SBCA to finance construction of a public building are retired, jurisdiction over that building transfers to the Department of General Services (DGS). (§ 15816, subd. (a).)

■ Chapter 3.1 of the SBCA (§ 15819.1 et seq.) concerns prison construction. Section 15819.05, subdivision (a), authorizes the board to issue revenue bonds, negotiable notes, or negotiable bond anticipation notes to finance the acquisition of prison facilities. Any bonds authorized by chapter 3.1 must be sold pursuant to sections 15832 and 15832.5. (§ 15819.5.) Section 15832 reads, in relevant part: "Upon receipt of a resolution of the board authorizing the issuance of bonds, the Treasurer shall provide for their preparation in accordance with the resolution. The bonds authorized to be issued shall be sold by the Treasurer, at public sale or at private sale, as directed by the board. . . ." ■ Section 15832.5 authorizes the sale of short-term notes in the same manner as bonds.

■ Unlike other public buildings, facilities constructed pursuant to chapter 3.1 "shall be and remain under the jurisdiction and control of, and shall be operated and maintained by, [CDCR]." (§ 15819.6.) "Construction of any prison facilities utilizing the financing methods authorized in [chapter 3.1] shall be done on behalf of the board by [CDCR]." (*Ibid.*) Thus, in the case of prisons, the board's sole role is to provide financing.

■ Under section 15819.9, rent received from the operation of a facility authorized under chapter 3.1 may be pledged for the payment of premium and interest on any bonds issued. Under section 15819.11, the board is also authorized to obtain hazard insurance and insurance against loss of revenue. A lease of prison facilities under chapter 3.1 may be for any term up to 35 years. (§ 15819.12.)

C. *Assembly Bill 900*

■ The Act adds several chapters to the SBCA and a number of Penal Code provisions. Government Code section 15819.40, subdivision (a), directs CDCR to "design, construct, or renovate housing units, support buildings, and programming space in order to add up to 12,000 beds at facilities under its jurisdiction." (Stats. 2007, ch. 7, § 2, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 1.) It also directs that all new beds be supported by

rehabilitative programming for inmates and states the purpose of the new construction is to replace existing temporary beds currently in use rather than house additional inmates. (§ 15819.40.)

Section 15819.40, subdivision (b), authorizes CDCR to "acquire land, design, construct, and renovate reentry program facilities to provide housing for up to 6,000 inmates" (Stats. 2007, ch. 7, § 2, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 1), while section 15819.40, subdivision (c), authorizes CDCR to construct new buildings at existing prisons "to provide medical, dental, and mental health treatment or housing for up to 6,000 inmates." (*Ibid.*)

Under Assembly Bill 900, the scope and cost of the projects are subject to approval and administrative oversight by the board. (§ 15819.401, added by Stats. 2007, ch. 7, § 2.) The board is authorized to "issue revenue bonds, negotiable notes, or negotiable bond anticipation notes . . . to finance the acquisition, design, and construction, including, without limitation, renovation, and the costs of interim financing of the projects authorized in Section 15819.40." (§ 15819.403, subd. (a), added by Stats. 2007, ch. 7, § 2, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 3.) However, authorized costs for all projects under subdivision (a) of section 15819.40 may not exceed $1.8 billion, while costs for all projects under subdivisions (b) and (c) of section 15819.40 may not exceed $975 million and $857.1 million respectively. (§ 15819.403, subd. (a).)

Section 15819.41 authorizes CDCR to design, construct or renovate buildings to provide medical, dental, and mental health treatment or housing for up to 2,000 inmates (§ 15819.41, subd. (b), added by Stats. 2007, ch. 7, § 3, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 5) and to construct, establish, and operate reentry program facilities to house up to 10,000 inmates (§ 15819.41, subd. (c), added by Stats. 2007, ch. 7, § 3, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 5). The board is authorized to issue bonds or notes not to exceed a total of $2,510,700,000 for this purpose. (§ 15819.413, subd. (a), added by Stats. 2007, ch. 7, § 3.)

Under chapters 3.11 (§§ 15820.90–15820.907) and 3.12 (§§ 15820.91–15820.918), the board is authorized to issue up to $1.22 billion in revenue bonds, notes, or bond anticipation notes to finance the acquisition, design, and construction of local jail facilities. (Stats. 2007, ch. 7, §§ 4, 5, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, §§ 9–13.) CDCR and any participating county are authorized, with board approval, to enter into leases for any new county facilities so constructed. (§§ 15820.90–15820.907, 15820.91–15820.918.)

In addition to the foregoing, the Act adds a number of Penal Code provisions relating primarily to the development and expansion of rehabilitation programs. (See Stats. 2007, ch. 7, §§ 6–29, as amended by Stats. 2009, 3d Ex. Sess., ch. 16, § 14.)

## II

### *Demurrer to Declaratory Relief Claim*

As an initial matter, plaintiffs contend that, irrespective of the merits of their claims, the trial court erred in sustaining defendants' demurrers, because the complaint states a cause of action for declaratory relief. Plaintiffs assert they may challenge the constitutionality of the Act in this litigation, and the relief to be attained is a declaration of whether or not the Act violates the state debt limit.

"The rules by which the sufficiency of a complaint is tested against a general demurrer are well settled. We not only treat the demurrer as admitting all material facts properly pleaded, but also 'give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' [Citation.] [¶] If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 38 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

 Code of Civil Procedure section 1060 authorizes an action for declaratory relief. "[I]n cases of actual controversy relating to the legal rights and duties of the respective parties," any person may bring an action for a declaration of his or her rights and duties in connection with that controversy. (Code Civ. Proc., § 1060.) "The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought." (*Ibid.*)

 "Declaratory relief is not available unless there is a real dispute between parties, 'involving justiciable questions relating to their rights and obligations.' [Citation.] 'The fundamental basis of declaratory relief is an actual, present controversy.' [Citation.] An actual controversy is 'one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.' " (*In re Claudia E.* (2008) 163 Cal.App.4th 627, 638 [77 Cal.Rptr.3d 722].)

The complaint here alleges the Act authorizes the board to issue up to approximately $7.4 billion in bonds to finance prison construction and CDCR to lease the resulting facilities from the board. It further alleges plaintiffs contend such scheme violates article XVI, section 1, whereas defendants contend the scheme is lawful. Finally, the complaint alleges defendants are seeking to sell bonds pursuant to this legislation.

Assuming the foregoing adequately alleges the existence of an actual, present controversy subject to declaratory relief, plaintiffs are not thereby necessarily entitled to relief on appeal. " 'Strictly speaking, a general demurrer is not an appropriate means of testing the merits of the controversy in a declaratory relief action because plaintiff is entitled to a declaration of his rights even if it be adverse.' [Citations.] However, 'where the issue is purely one of law, if the reviewing court agreed with the trial court's resolution of the issue it would be an idle act to reverse the judgment of dismissal for a trial on the merits. In such cases the merits of the legal controversy may be considered on an appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend and the opinion of the reviewing court will constitute the declaration of the legal rights and duties of the parties concerning the matter in controversy.' " (*Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 24 [34 Cal.Rptr.3d 588].)

As we shall explain, the issue presented in this matter is one of law, which we may resolve without reference to evidence. Therefore, it would be an idle act to reverse the order sustaining defendants' demurrers.

## III

### *Preliminary Matters*

The present matter involves a facial challenge to the Act. "When a statute is attacked as unconstitutional on its face, the attacker 'cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute'; instead, the challenger 'must demonstrate that the act's provisions inevitably pose a *present* total and fatal conflict with applicable constitutional prohibitions.' [Citations.] The corollary of this burden is that if this court can conceive of a situation in which [the statute] could be applied without entailing an inevitable collision with and transgression of constitutional provisions, the statute will prevail over [a] challenge." (*People v. Harris* (1985) 165 Cal.App.3d 1246, 1255–1256 [212 Cal.Rptr. 216].)

"In considering the constitutionality of a legislative act we presume its validity, resolving all doubts in favor of the Act. Unless conflict with a

provision of the state or federal Constitution is clear and unquestionable, we must uphold the Act." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193] (*Elliott*).) Where possible, "[w]e must construe an enactment to preserve its constitutional validity, and we presume that the enactors understood the constitutional limits on their power and intended the enactment to respect those limits." (*Save Our Sunol, Inc. v. Mission Valley Rock Co.* (2004) 124 Cal.App.4th 276, 284 [21 Cal.Rptr.3d 171].)

■ In ruling on defendants' demurrers, the trial court relied on the special fund exception and concluded that, because the board's obligation to repay bondholders will be limited to the special fund maintained from rent payments, there is no constitutional violation. Section 15830 limits payment on any bonds issued by the board to the "revenues, rentals, or receipts received from the operation of the public building or buildings financed by such bonds." (§ 15830.) It further provides that no bond issued pursuant to the SBCA "shall be or become a lien, charge, or liability against the State of California or against its property or funds." (§ 15830.)

Plaintiffs contend the special fund exception is inapplicable to the Act, because no true "special fund" is created where bonds are to be repaid from the state's general fund. Plaintiffs argue the state will merely be transferring general funds from one agency to another before making the bond payments, and that transfer will not change the nature of the payments' source.

Defendants counter that the trial court was correct in concluding the leases contemplated by the Act will create a special fund and the special fund constitutes the exclusive source for payment to bondholders. They further argue that, in any event, the leases fall within the contingency exception to the state debt limit.

■ As we shall explain, we need not decide whether the obligation of the board to make bond payments falls within the special fund exception to the state debt limit. We conclude instead that, viewed as a whole, the financing scheme contemplated by the Act falls within the contingency exception to the state debt limit, inasmuch as payments from CDCR to the board, and from the board to bondholders, will be based on use or availability of the facilities constructed with the bond proceeds during the period in which future payments will be made. Hence, the pay-as-you-go principle underlying the state debt limit is satisfied.

Plaintiffs have requested that we take judicial notice of certain legislative history materials regarding Assembly Bill 900 and a companion bill that was not enacted, that would have authorized $6.9 billion in revenue bonds and a

$100 million general fund appropriation for prison health care construction. Plaintiffs argue these documents "support the contention that notwithstanding the Governor's Emergency Declaration concerning State Prisons, the State Senate did not find the necessity to authorize an additional $7 billion for prison construction." Because we fail to see what bearing this would have on the issues presented in this matter, we deny the request for judicial notice.

IV

*The Special Fund Exception*

The trial court concluded that, because the Act provides for the bonds to be repaid from a special fund financed solely from CDCR's rent payments, no debt will be created. Regarding plaintiffs' argument that the special fund exception is inapplicable where the so-called special fund is financed solely from the general fund, the court said: "While the cited cases involved third party entities, there is no reason to conclude that the same analysis would not be applied to the financing mechanism involved here, i.e., where all entities involved are subdivisions of the State of California. See 27 Cal.Apps.Atty.Gen. 113. Indeed, the Court of Appeal, Third Appellate District, has opined as follows: [¶] 'It is the general rule that an indebtedness, within the meaning of a constitutional limitation imposed upon a legislative body, does not arise unless there is a legal, equitable or moral obligation to pay a sum of money to another who occupies the position of creditor and who has a legal or moral right to call upon or constrain the debtor to pay; and that such a debt limitation is not concerned with an obligation which is payable out of a special fund if there is no accompanying liability or constraint to pay from the general fund should the special fund prove insufficient.' . . . *Board of State Harbor Commissioners for San Francisco Harbor v. Dean* (1953) 118 Cal.App.2d 628, 632 [258 P.2d 590]."

We assume the trial court's reference to "27 Cal.Apps.Atty.Gen. 113" was actually intended to be a reference to 27 Ops.Cal.Atty.Gen. 115 (1956), the subject of which is the application of article XVI, section 1 to the SBCA. Defendants request that we take judicial notice of this opinion, as well as another Attorney General opinion, attached as exhibits E and F to their May 27, 2008 request for judicial notice. They argue these opinions are subject to judicial notice under Evidence Code section 452, subdivision (c), as official acts of the executive department of the state. However, the only official act associated with these Attorney General opinions is the issuance of the opinions, not their substance. We take judicial notice of facts, such as the fact that the Attorney General issued these two opinions, not legal opinions. Nevertheless, we need not take judicial notice of the Attorney General

opinions in order to consider them for whatever value they may have in assessing the legal issues raised in this matter.

In 27 Ops.Cal.Atty.Gen. 115, the Attorney General concluded the SBCA does not violate the state debt limit, because it provides for the bonds issued to finance the construction of state buildings to be repaid solely from a special fund maintained from revenues for use of the buildings. The Attorney General opined it does not matter that the source of those revenues may be, or most likely will be, the general fund. (27 Ops.Cal.Atty.Gen., *supra*, at p. 120.) According to the Attorney General: "The important consideration is not whether the funds may or even most likely will come in part from the general funds of the State, but whether they *must* come from this source in the event the special fund proves insufficient [citations]." (*Ibid.*)

In *Board of State Harbor Comrs. v. Dean, supra*, 118 Cal.App.2d 628 (*Board of State Harbor Comrs.*), the legislation in question authorized the issuance of revenue bonds in the amount of $6 million to construct certain improvements for San Francisco Harbor. The act provided for repayment of the bonds solely from the revenue obtained through operation of the harbor facilities and provided that the bonds would not become a lien against the state and had to so state on their face. (*Id.* at pp. 630–631.) This court stated the general rule that article XVI, section 1 "is not concerned with an obligation which is payable out of a special fund if there is no accompanying liability or constraint to pay from the general fund should the special fund prove insufficient." (118 Cal.App.2d at p. 632.)

Neither the Attorney General opinion nor *Board of State Harbor Comrs.* answers the question posed here, i.e., whether the special fund exception applies where all the amounts paid into the special fund come from the general fund. The Attorney General expressly distinguished a case from the State of Washington, *State ex rel. Wash. etc. v. Yelle* (1955) 47 Wn.2d 705 [289 P.2d 355], in which the statute at issue permitted leasing of the facilities constructed with bond financing *only* by state agencies and obligated the state treasurer to transfer funds to pay the rent. (27 Ops.Cal.Atty.Gen., *supra*, at p. 118.) According to the Attorney General, there is nothing in the SBCA that requires buildings constructed with bond financing to be leased by state agencies or the state to pay rent in the absence of occupancy. (27 Ops.Cal.Atty.Gen., *supra*, at p. 121.) In other words, as we shall explain in the next section, the state's obligation under the SBCA was *contingent* on occupancy. Hence, the Attorney General opinion actually turns on application of the contingency exception rather than the special fund exception. (See 27 Ops.Cal.Atty.Gen., *supra*, at pp. 122–123.)

*Board of State Harbor Comrs.* involved a routine special fund case in which the bonds were to be repaid from the proceeds, provided by private

parties rather than state agencies, of operating the new harbor facilities. We stated: "If the contract be in such form that the general revenues cannot be drawn upon, even though the special fund proves insufficient for all of the demands that may be made upon it, if no forfeiture of state interest can occur, then the case will not be one outside the scope of the [special fund] doctrine." (*Board of State Harbor Comrs., supra*, 118 Cal.App.2d at p. 635.)

We are aware of no reported case in this state in which the special fund exception to the state or local debt limit was applied where the special fund was maintained from general funds paid by one governmental agency to another for use of the facilities. At the hearing on defendants' demurrers, defense counsel indicated the closest reported decision to the situation presented here is *Elliott, supra*, 17 Cal.3d 575. There, the state high court examined the Zenovich-Moscone-Chacon Housing and Home Finance Act (Health & Saf. Code, former § 41000 et seq., now § 50000 et seq.), which authorized the California Housing Finance Agency to issue revenue bonds in the aggregate amount of $450 million, with the proceeds to be made available in the form of development loans, construction loans, mortgage loans, and advances in anticipation of such loans for constructing low-income housing and related facilities. The act further appropriated $10 million from the general fund to be paid into a supplementary bond security account to secure payment of principal and interest on the bonds. (17 Cal.3d at pp. 580–581.)

The high court concluded no state debt had been created under these circumstances, explaining: "Strictly speaking, the debts which will be created by the Act are debts of the Agency, not of the state, for they are to be paid not from the general funds of the state but from the housing project revenues (or, if necessary, from the reserve security fund already appropriated by the Legislature). We have held that debts which are payable solely from a special fund rather than from the state's general funds do not violate article XVI, section 1." (*Elliott, supra*, 17 Cal.3d at p. 587.)

Although $10 million in general funds had been allocated for payment on the bonds in the event the special fund proved inadequate, this $10 million was not a pledge of future payments, which might amount to a debt, but an appropriation of current funds to be used in the future as needed. Where there is an actual appropriation at the time the project is established, no debt has been created. (See *Flournoy v. Priest* (1971) 5 Cal.3d 350, 352–353 [95 Cal.Rptr. 793, 486 P.2d 689].)

The defendant in *Elliott* argued the "state will be required by *practical* considerations to commit its general resources to the payment of these bonds in the event of a default." (*Elliott, supra*, 17 Cal.3d at p. 587.) The high court disagreed, concluding that because the legislation did not create any *enforceable* obligation against the state's general fund, there was no *enforceable*

debt, notwithstanding that the state might otherwise consider itself obligated to make good on the bonds in order to protect its future borrowing power. (*Id.* at p. 588.)

*Elliott* is not comparable to the present matter. It is rather, like *Board of State Harbor Comrs.*, a typical application of the special fund exception, where the challenged legislation authorizes bonds to finance construction of facilities and then provides for payment on those bonds from proceeds received from private parties, not a governmental agency, for use of the facilities.

In *City of Oxnard v. Dale, supra*, 45 Cal.2d 729, the high court explained that a debt repayable from a special fund will *not* fall within the special fund exception if the governmental body is required to maintain the special fund from its general fund or through its taxing powers. (*Id.* at p. 737.) In other words, it is the requirement that the governmental entity resort to its general funds or taxing power to finance the project, rather than relying on funds provided by private parties that creates the potential for a prohibited debt.

Plaintiffs argue the special fund exception does not apply here, because section 15819.7 provides that revenue bonds issued by the board under the SBCA " 'shall be a debt and liability of the state payable from the General Fund of the state.' " Plaintiffs misquote the indicated section. It reads, in its entirety: "Amounts necessary to pay rent for the public buildings financed pursuant to this chapter and under and pursuant to a prison facilities lease are hereby appropriated without regard to fiscal year from the General Fund, but shall become available for expenditure only if the Department of Finance certifies to the Controller that the amount required to pay this rent has not been included in the Budget Act for that fiscal year for the support of [CDCR]." (§ 15819.7.) Whatever else this provision says, it does not say bonds issued by the board are a debt of the state payable from the general fund.

At any rate, we need not decide in the present matter if the board's issuance of bonds pursuant to the Act falls within the special fund exception to the state debt limit. As we shall explain in the next part, the overall scheme authorized by the Act falls outside the state debt limit by virtue of the contingency exception.

V

*The Contingency Exception*

Throughout their arguments, plaintiffs make much of the fact that the Act, like the broader SBCA of which it is a part, uses the board as an intermediary

to issue bonds and collect rent payments. They assert the payment of rent by CDCR to the board is a "fabrication" intended to hide direct payments to bondholders from the general fund. Of course, implicit in this argument is that, if CDCR issues the bonds and is obligated to make payments directly to bondholders from general funds allocated to it, a debt would be created within the meaning of the state debt limit. However, as we shall explain, resolution of this matter does not turn on whether the bonds are issued by the board or CDCR or whether payments from the general fund will be made to bondholders from CDCR directly or through the board. Rather, the fundamental question is the nature of the obligation undertaken by the state to the bondholders.

As noted earlier, article XVI, section 1 prohibits the Legislature from creating any debt above the statutory maximum without a two-thirds vote and approval of the people. When the Legislature authorizes a scheme that potentially creates an indebtedness, it does not matter how many state agencies it involves. It is still the Legislature creating a debt. Thus, it is immaterial whether the Legislature directs CDCR to issue bonds to finance construction of prisons and pay off the bonds with funds allocated to it from the general fund, or the Legislature directs the board to issue bonds to finance construction of prisons, CDCR to pay the board rent for the prisons, and the board to pay off the bonds from the rent payments. The question is whether the state, by way of CDCR or the board, has undertaken a debt to the bondholders.

■ As explained earlier, a sum payable upon a contingency is not a debt within the meaning of the constitutional debt limits. (*Doland v. Clark, supra,* 143 Cal. at p. 181.) Under the *Offner-Dean* contingency exception, no debt is created where future payments by a governmental entity are contingent on property, goods, or services being made available to the entity during future periods. (*Pension Obligation, supra,* 152 Cal.App.4th at p. 1398.) However, the exception goes even further. Where the governmental entity enters into a multiyear lease that requires it to make rent payments even though it ceases using the facility, no debt is created. The fact that future rent payments are for use *or availability* of the facilities in those future periods takes the matter outside the debt limit.

Thus, in *Byram, supra,* 36 Cal.2d 694, the state Supreme Court upheld an arrangement whereby a county retirement board built a courthouse on county property and leased it to the county. The lease required the county to pay monthly rent calculated to reimburse the retirement board for the construction costs, expenses and interest and provided that " 'each month's rental shall become due only in consideration of the right to possess, occupy, and use' " the premises during the preceding month. (*Id.* at p. 696.) The lease further

provided the county with an option to purchase at any time but prohibited either party from terminating the lease until the retirement board recovered its investment. (*Ibid.*)

Although the high court concluded this arrangement fell within the obligations imposed by law exception to the local debt limit, it also held the transaction satisfied the *Offner-Dean* contingency exception. According to the court, the monthly obligation to pay rent was contingent on the courthouse being made available to the county each month, and the payment of rent was for the use or availability of the facility during that month. (*Byram, supra,* 36 Cal.2d at pp. 698–700.)

In *City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473 [55 Cal.Rptr.2d 422] (*Rider I*), the Court of Appeal considered a scheme whereby the city's public facilities financing authority would lease a stadium from the city, construct improvements thereon using bond financing, lease the stadium back to the city, and repay bondholders from rent received from the city. (*Id.* at p. 1477.) Under this scheme, rent payments were set at an amount necessary to service the bonds and pay bond administration. In the event of default on rent payments, the authority had the option either to continue collecting rent without taking possession, or to take possession of the stadium, lease the premises to another, and collect any deficiency from the city. In other words, the city remained liable for the rent throughout the lease term. However, bond investors were advised that, upon any default, rent payments could not be accelerated but could only be collected as they came due. (*Id.* at pp. 1479–1480.)

The Court of Appeal found no violation of the local debt limit. (*Rider I, supra,* 47 Cal.App.4th at pp. 1477–1478.) The court explained: "In an uninterrupted line of decisions approving government commitments of every kind—from agreements to haul sewage to leases of offices and courthouses—our high court has sanctioned contracts in which public entities have entered into long-term obligations without obtaining voter approval. As the Supreme Court has consistently stated, the question is whether the public entity's debt incurred in a particular year is a debt that can be paid from that year's income. If the answer is yes, the public entity has not incurred constitutionally prohibited indebtedness under article XVI, section 18, and, thus, no public vote is required. In other words, if no indebtedness comes about until consideration is furnished, there is no violation of the 'pay-as-you-go' rule." (*Id.* at p. 1482.)

In *Rider II*, the City of San Diego operated a convention center under a management agreement with the San Diego Unified Port District, the owner of the center. In order to expand the convention center, the city and port district entered into a joint powers agreement creating the Convention Center Expansion Financing Authority. The port district then agreed to lease the convention center and the site of the planned expansion to the financing authority, the financing authority arranged to issue revenue bonds to finance construction, the financing authority agreed to sublease the convention center to the city, the city agreed to pay rent equal to the debt service on the bonds and administration expenses, and the port district agreed to pay the city $4.5 million each year to help the city meet its obligations to the financing authority. After all payments were made on the bonds, title to the expansion would vest in the port district, the leases would expire and the financing authority would dissolve. (*Rider II, supra*, 18 Cal.4th at pp. 1039–1040.)

The Supreme Court rejected the plaintiffs' argument that the rent payments constituted a prohibited debt. The court explained: "[W]e have long held that the debt limitation in [article XVI,] section 18 does not apply when a local government enters into a contingent obligation. 'A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens. [Citation.]' [Citations.] We have repeatedly applied this principle to uphold multiyear contracts in which the local government agrees to pay in each successive year for land, goods, or services provided during that year. [Citation.] These contracts allow local governments to avoid price volatility from year to year and to negotiate lower prices overall by making long-term commitments. The classic example of this type of contract is a lease agreement. In such cases, we have reasoned that a debt for the aggregate of all rent payments does not arise at the time the parties execute the lease so long as liability for each individual rent payment is contingent on continued use of the leased property during the period corresponding to that rent payment. [Citation.]" (*Rider II, supra*, 18 Cal.4th at p. 1047.)

But the fact that a financing scheme involves periodic payments for periodic use of facilities does not necessarily bring it within the contingency exception. In *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164 [140 Cal.Rptr. 73] (*Starr*), the city entered into a financing arrangement with the San Francisco Redevelopment Agency whereby the agency would issue bonds to finance the development of a particular area in the city and the city would lease the facilities from the agency at a rate sufficient to amortize the bonds. (*Id.* at p. 168.) The agreement also provided that, at some future date, the parties would enter into a "repayment contract" calling for the creation of "a special fund consisting of designated tax revenues and income derived from the project." (*Id.* at pp. 169–170.) This special fund was to be used to repay an indebtedness incurred by the agency with the United States Department of Housing and Urban Development (HUD) to help finance the

project. (*Id.* at p. 170.) However, the repayment contract further provided that if sufficient funds had not been deposited in the special fund to meet this obligation, the city would make up the deficit from whatever source it may lawfully use. The parties conceded the city intended to use property taxes and other general funds to meet this obligation. (*Ibid.*)

The Court of Appeal concluded the rent payments fell within the contingency exception to the local debt limit. (*Starr, supra,* 72 Cal.App.3d at p. 172.) However, it further found the repayment contract created a prohibited debt, explaining: "It is immediately apparent that the payment due from the City to satisfy the Agency's liability in 1980 is unsupported by consideration. The contract itself does not designate such payments as 'rentals' or as made in consideration for use and occupancy of the premises. Rather, the purpose of the repayment clause is recited to be that 'the Agency and the City desire to assure HUD that the Agency's obligation under the Loan and Capital Grant Contract with the Agency will be met.' The City and the Agency concede that none of the City's payments on the Agency's HUD indebtedness can be credited toward the City's rental obligations." (*Id.* at p. 173.) The court continued: "Further, contrary to the strictures of the *Offner-Dean* rule that the lease create an indebtedness only for each installment of rent as it falls due, the effect of the repayment clause is to create an aggregate indebtedness on the part of the City above and beyond yearly rental payments." (*Ibid.*)

In *Starr,* the city obligated itself to make rent payments in amounts necessary to retire the bonds issued by the agency to construct the facilities. This obligation fell within the scope of the contingency exception. However, the city also obligated itself to contribute to the agency's payoff of the HUD loan, which was a separate indebtedness incurred to finance construction of the facilities. Because this latter obligation was not tied to rent payments or use of the facilities, it did not fall within the contingency exception.

In the present matter, the Act authorizes CDCR to enter into leases with the board for terms of up to 35 years for the use of prison facilities constructed with the proceeds of bonds issued by the board. Because each lease payment is contingent on future use or availability of the facilities and is consideration for such future use, no debt will be created within the meaning of article XVI, section 1. This is true even if the leases are structured in such a way as to resemble an installment purchase by providing for lease payments in amounts necessary to retire the bonds issued to finance the project and transfer of ownership of the facilities to CDCR at the end of the lease terms. It is also true even if the leases provide that CDCR must continue making lease payments even if it ceases to use the facilities.

But that does not end our inquiry. Even if the lease payments by CDCR to the board are insulated from the state debt limit by the contingency exception, there is still the matter of the board's obligation under the bonds. However, in this regard, it must be recalled that plaintiffs have mounted a facial challenge to the Act. Thus, the question on appeal is whether there is *any* set of circumstances under which the board may issue bonds under the Act that will bring the overall scheme within the contingency exception. If so, then the facial challenge must fail. (*People v. Harris, supra,* 165 Cal.App.3d at pp. 1255–1256.)

 Plaintiffs contend the complaint alleges that "there is no set of circumstances which exist under which the [Act] would be valid." However, the allegation to which plaintiffs refer states: "[T]he use of revenue bonds pursuant to Government Code § 15830 is limited to uses which will retire the bonds from revenues generated other than by tax revenue from the California State General Fund unless there is prior voter approval as provided in [article XVI, section 1]." In other words, plaintiffs assert there is no set of circumstances under which the Act would not violate the debt limit, because general funds would be used to retire the bonds. However, we have already explained that general funds may be used to retire bonds as long as periodic payments on those bonds are tied to periodic use or availability of the facilities.

 The SBCA expressly prohibits the board from pledging the credit or taxing power of the state in connection with the issuance of bonds. (§§ 15811, 15830.) Any bonds to be issued must "contain a recital on the face thereof stating that neither the payment of the principal nor any part thereof, nor any interest thereon, constitutes a debt, liability, or general obligation of the State of California other than as provided in this part." (§ 15830.)

It is readily apparent that if bonds issued under the Act are consistent with the foregoing and contain the same restrictions as a lease between CDCR and the board, i.e., bondholders are paid solely from rent payments and only if and when rent payments are received, there would be no unconstitutional debt created. In other words, the bonds may be structured in such a way that bondholders will be repaid only as rent payments are received, and the credit or taxing power of the state is not implicated in the event of default. Thus, the Act may be implemented in such a way that the state debt limit is not violated.

On the other hand, section 15841 provides in part: "The rights and remedies conferred by this part upon or granted to bondholders are in addition to and not in limitation of any rights and remedies lawfully granted to such bondholders by the resolutions providing for the issuance of bonds, or by any deed of trust, indenture, or other agreement under which the bonds are

issued." In other words, bonds issued under the Act may grant bondholders greater rights than merely the right to receive payment if and when rent is received from CDCR. As in *Starr*, the board may be required to provide further assurances of payment in order to induce purchase of the bonds. (See *Starr, supra*, 72 Cal.App.3d at p. 173.)

However, we need not confront that issue here. As indicated, plaintiffs have mounted a facial challenge to the Act. Therefore, we need only decide if bonds may be issued under the Act that do not run afoul of the state debt limit. We have so concluded. In light of section 15830, which provides that bonds issued to finance the construction of public buildings are special obligations secured solely by the revenues received from the operation of the public buildings financed by such bonds and precludes bondholders from looking to the general fund or the state's taxing power to pay principal or interest on the bonds except as provided for use of the facilities, there is no reason to believe the board cannot structure the bonds to be issued under the Act so as to avoid the state debt limit.

Plaintiffs nevertheless contend our conclusion flies in the face of the underlying purpose of the state debt limit, because any bonds issued pursuant to the Act would effectively burden the taxpayers of tomorrow with the prison expenses of today.

Plaintiffs misunderstand the nature of the constitutional debt limits. As described earlier, the underlying purpose of those limits is to force governments to live within their means by prohibiting them from financing current expenses with future revenue. Thus, if the state were to borrow $1 billion today to pay for current expenses, such as welfare benefits or employee salaries, and pay off the loan over the next several years, that would be burdening the taxpayers of tomorrow with the expenses of today. However, when a government constructs a facility that will be used for many years, it has created an asset that will benefit both current and future taxpayers. It is therefore appropriate that future taxpayers help pay for that benefit as it is used up. If, as plaintiffs suggest, the construction of a prison today should be paid for by the taxpayers of today, it is the taxpayers of tomorrow who would reap a windfall.

In this instance, the Act provides a scheme by which large capital expenditures for prison facilities may be paid for as those facilities are used. This is consistent with the pay-as-you-go principle underlying the constitutional debt limits. Therefore, the trial court properly sustained the demurrers to plaintiffs' complaint.

## VI

### Leave to Amend

Plaintiffs contend the trial court erred in denying leave to amend in order to allow them an opportunity to obtain evidence that the bonds and leases to be created under the Act will in fact violate the state debt limit. Plaintiffs argue they would have been able to show the proposed leases will be disguised purchase agreements.

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) To meet this burden, the plaintiff must demonstrate how the complaint can be amended to state a cause of action. Such showing may be made to the trial court or, if no request is made for leave to amend, at the appellate level. (Code Civ. Proc., § 472c; *Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1386 [272 Cal.Rptr. 387].) In either case, the general rule is for liberal construction of the complaint with a view to substantive justice between the parties. (*Careau & Co.*, at p. 1387.)

Because the present matter is a facial challenge to the Act, there is no basis for granting plaintiffs an opportunity to obtain evidence regarding the nature of the bonds and leases actually used by the state. A facial challenge rests on whether the Act *can* be implemented in such a way as to avoid a constitutional infirmity, not whether the Act is in fact so implemented. And, as we have explained, under the contingency exception, it does not matter that the proposed lease resembles an installment purchase agreement as long as the periodic payments are based on future use or availability of the facilities.

Nevertheless, read liberally, plaintiffs' argument suggests they should have been given an opportunity to obtain evidence regarding the bonds and leases ultimately issued under the Act in order to provide them a basis for amending their complaint to allege such bonds and leases violate the state debt limit. However, at this point, it is mere speculation whether the bonds and leases will violate the state debt limit. Plaintiffs are not entitled to leave to amend based solely on speculation. Rather, they have the burden of establishing how the complaint may be amended to state a claim. They have not done so.

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Nicholson, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 17, 2009, S172739.